UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
OCEANA, INC.,                             )
                                          )
              Plaintiff,                   )
                                          )
       v.                                 )       Civil Action No. 12-0041 (PLF)
                                          )
PENNY PRITZKER,                           )
United States Secretary of Commerce, et al., )
                                          )
              Defendants.                  )
                                          )
_____ )


OPINION

       Oceana, Inc. challenges a Biological Opinion issued by the National Marine

Fisheries Service ("NMFS"), in which NMFS has determined that the combined operation of

seven fisheries is not likely to jeopardize the continued existence of the Northwest Atlantic

Distinct Population Segment of loggerhead sea turtles. Oceana contends that the Biological

Opinion is arbitrary and capricious and therefore seeks its vacatur. NMFS responds that its

scientific judgment is entitled to deference. Both sides have filed motions for summary

judgment. For the reasons explained in this Opinion, the Court will grant in part and deny in part

each side's motion for summary judgment and it will remand this matter to the agency for the

limited purposes set forth in the discussion below.[1]

_____

[1]      The papers considered in connection with the pending motions include: Oceana's
amended complaint ("Am. Compl.") [Dkt. No. 33]; NMFS' answer to Oceana's amended
complaint ("Answer") [Dkt. No. 35]; Oceana's motion for summary judgment ("Oceana MSJ")
[Dkt. No. 37]; NMFS' cross-motion for summary judgment and memorandum in support thereof
("NMFS MSJ") [Dkt. Nos. 40 & 41]; Oceana's combined reply in support of its motion for
summary judgment and opposition to NMFS' cross-motion for summary judgment ("Oceana
Opp.") [Dkt. No. 42]; NMFS' reply in support of its cross-motion for summary judgment

## I. STATUTORY AND REGULATORY FRAMEWORK

The Endangered Species Act of 1973, as amended, 16 U.S.C. § 1531 et seq., has been regarded as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). The ESA "seeks to protect species of animals against threats to their continuing existence caused by man." Lujan v. Defenders of Wildlife, 504 U.S. 555, 558 (1992). Under the ESA, species may be listed either as "endangered" or as "threatened." See 16 U.S.C. § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The ESA is jointly administered by two federal agencies: the Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service. 50 C.F.R. § 402.01(b). FWS administers the statute with respect to species under the jurisdiction of the Secretary of the Interior, while NMFS covers those species under the jurisdiction of the Secretary of Commerce. Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 651 (2007).

"Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. at 652. Under Section 7(a)(2), "[e]ach Federal agency shall, in consultation with and with the assistance of [FWS or NMFS], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction

("NMFS Reply") [Dkt. No. 45]; NMFS' supplemental memorandum ("NMFS Supp. Memo.") [Dkt. No. 49]; and Oceana's supplemental memorandum ("Oceana Supp. Memo.") [Dkt. No. 50].

or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).[2]  Formal

consultation under Section 7 is only required, however, where a federal agency has concluded

after an initial review that its action "may affect listed species or critical habitat."  See 50 C.F.R.

§ 402.14(a).  At the conclusion of the Section 7 consultation process, FWS or NMFS must issue

a Biological Opinion ("BiOp"), "setting forth [its] opinion, and a summary of the information on

which the opinion is based, detailing how the agency action affects the species or its critical

habitat."  16 U.S.C. § 1536(b)(3)(A); see also 50 C.F.R. § 402.14(h).

       When the BiOp concludes that jeopardy is likely to result from the action under

review, the consulting agency "shall suggest those reasonable and prudent alternatives which [it]

believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]."  16 U.S.C.

§ 1536(b)(3)(A); see also 50 C.F.R. § 402.14(h)(3).  "Following the issuance of a 'jeopardy'

opinion, the agency must either terminate the action, implement the proposed alternative, or seek

an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C.

§ 1536(e)."  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. at 652.  Where the

consulting agency concludes that the agency action is not likely to jeopardize the continued

existence of the species but is nonetheless likely to result in some "incidental take," the BiOp

must set forth an Incidental Take Statement, which specifies the permissible "amount or extent"

of this impact on the species.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  "Take" is defined

by the ESA as meaning "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

---

[2]       The agency whose action is under examination is known as the "action agency,"
while either FWS or NMFS serves as the "consulting agency."  See Nat'l Wildlife Federation v.
NMFS, 524 F.3d 917, 924 (9th Cir. 2007).  In this case, NMFS is both the "action agency" and
the "consulting agency."  NMFS' Sustainable Fisheries Division of its Northeast Regional Office
administers the fisheries management programs governing the seven fisheries, which makes it
the action agency here.  Am. Compl. ¶ 22; see AR 52237, 52243.  The Protected Resources
Division of the same Regional Office served as the consulting agency and authored the
Biological Opinion.  Am. Compl. ¶ 21; see AR 52237, 52243.

collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).  Although Section 9 of the ESA prohibits takes of listed species, 16 U.S.C. § 1538(a)(1), incidental takes are permissible if they occur in accordance with the conditions set forth in an Incidental Take Statement. 50 C.F.R. § 402.14(i)(5).  These conditions include "reasonable and prudent measures" that are considered "necessary or appropriate to minimize" the extent of incidental taking. 50 C.F.R. § 402.14(i)(1)(ii).  The action agency is "required" to reinitiate Section 7 consultation "immediately" if the amount or extent of taking specified in the Incidental Take Statement is exceeded. 50 C.F.R. §§ 402.14(i)(4), 402.16(a).

In formulating a Biological Opinion, FWS and NMFS must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). A BiOp constitutes final agency action subject to judicial review under the Administrative Procedure Act. See Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

## II.  BACKGROUND

In December of 2014, this Court issued an Opinion and an Order addressing Oceana's challenge to a separate Biological Opinion, in which NMFS had concluded that the operation of the Atlantic Sea Scallop Fishery was not likely to jeopardize the continued existence of the same loggerhead turtle population at issue in the present case, the Northwest Atlantic Distinct Population Segment. See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d 469 (D.D.C. 2014). The Court largely rejected Oceana's arguments, but agreed with Oceana that the provisions of the BiOp's Incidental Take Statement might not be sufficient to ensure that NMFS could determine when the take limits had been exceeded.  As a result, the Court remanded the BiOp to NMFS for reconsideration or further explanation of those provisions. See id. 497-99.

At issue in the present case is a Biological Opinion addressing the impact of seven other fisheries on the Northwest Atlantic Distinct Population Segment of loggerheads.[3]  These seven fisheries are the:  (1) Northeast Multispecies; (2) Monkfish; (3) Spiny Dogfish; (4) Atlantic Bluefish; (5) Northeast Skate Complex; (6) Mackerel, Squid, and Butterfish; and (7) Summer Flounder, Scup, and Black Sea Bass Fisheries.[4]  Oceana maintains that the BiOp is deficient for a variety of reasons, and argues that this Court should vacate the BiOp and direct NMFS to reinitiate consultation under the Endangered Species Act with respect to the seven fisheries.  See Am. Compl. at 38 (prayer for relief).

The fisheries employ a variety of gear types that can cause harm to loggerheads.  "Sink gillnets and bottom otter trawls are the two predominant gear types used in the seven fisheries."  AR 52253.  Sink gillnets are panels of netting "in which fish are incidentally snaggled or entangled."  Id.  Gillnets are hung from a floating line on the surface of the water and are weighted down at their bottoms.  Id.  These gillnets also entangle loggerhead turtles, which can cause serious injury and death.  AR 52455.  In fact, "[g]illnets are so effective at catching sea turtles they were commonly used in the historical sea turtle fishery."  Id.  "Bottom

---

[3]    On September 22, 2011, NMFS and FWS issued a Final Rule that divided the worldwide population of loggerheads into nine Distinct Population Segments ("DPS"), each of which was separately listed either as endangered or as threatened under the ESA.  See 76 Fed. Reg. 58,868 (Sept. 22, 2011).  This case concerns just one of these Distinct Population Segments:  the Northwest Atlantic DPS ("NWA DPS"), whose range extends north of the equator, south of 60° N latitude, and west of 40° W longitude.  AR 52316.  The NWA DPS — which, in the proposed version of the Rule, had been listed as endangered — ultimately was listed as a threatened species in the Final Rule.  AR 52315; see also 76 Fed. Reg. 58,868, 58,917-24, 58,945-46.  In this Opinion, all references to "loggerheads" pertain only to the NWA DPS of loggerheads.

[4]    The BiOp's formal name is the *Endangered Species Act Section 7 Consultation on the Continued Implementation Management Measures for the Northeast Multispecies, Monkfish, Spiny Dogfish, Atlantic Bluefish, Northeast Skate Complex, Mackerel/Squid/Butterfish, and Summer Flounder/Scup/Black Sea Bass Fisheries*, Consultation No. F/NER/2012/01956 (Dec. 16, 2013), *available at* http://www.greateratlantic.fisheries.noaa.gov/protected/section7/bo/ actbiops/batchedfisheriesopinionfinal121613.pdf.

trawls are typically cone-shaped nets towed on the bottom" of the seafloor, which feature "[l]arge, rectangular doors" that keep the mouth of the net open while it is towed.  AR 52254. Like gillnets, bottom trawls can entangle or capture loggerheads, leading to serious injury and death.  AR 52455.  In addition to gillnets and trawls, the fisheries utilize trap/pot gear and bottom longlines.  AR 52254.  Both of these gear types also are known to pose threats of injury and death to loggerhead turtles.  AR 52455-56, 52463-64.

The BiOp assesses the impact of the seven fisheries together as a "batch," AR 52252, which departs from NMFS' prior practice of analyzing each fishery's effects in a separate Section 7 consultation.  See AR 52243-53.  In 2010, NMFS issued separate BiOps for each of these seven fisheries.  AR 52243-51.  In 2012, NMFS reinitiated Section 7 consultation and decided to use a "batched" approach instead.  AR 52251.  Under this approach, the BiOp defines the "proposed action" under review as "the continued operation of the [seven] fisheries managed under seven [Fisheries Management Plans]."  AR 52251.  NMFS has estimated that this action will result in up to 483 loggerhead "takes" per year, of which up to 239 may be lethal.  AR 52478-81, 52508.  NMFS ultimately concludes, however, that these effects of the operation of the seven fisheries are not likely to jeopardize the continued existence of the species.  AR 52510-15; see 16 U.S.C. § 1536(a)(2).  This "no-jeopardy determination" is the ultimate target of Oceana's challenge to the BiOp.  Although NMFS found no jeopardy, it did, as noted above, estimate that several hundred loggerhead takes would occur annually in the seven fisheries, and the agency therefore included an Incidental Take Statement in the BiOp.  Oceana also challenges the sufficiency of the measures included in that portion of the BiOp, arguing that NMFS has not demonstrated its ability to monitor the number of loggerhead takes occurring on an annual basis.

In the present suit, Oceana raises certain arguments that this Court already considered in connection with Oceana's earlier challenge to the Sea Scallop BiOp.  In particular, Oceana challenges NMFS' interpretation of a regulatory phrase that defines a key statutory term. The Endangered Species Act obligates federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species," 16 U.S.C. § 1536(a)(2), but the statute does not define the phrase "jeopardize the continued existence of."  NMFS and FWS define that phrase by regulation as meaning "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  And in this BiOp, as it did in the Sea Scallop BiOp, NMFS applied an interpretation of "reduce appreciably" that examined whether the action would cause a "considerable or material reduction in the likelihood of survival and recovery" of the species.  See Oceana MSJ at 3 n.2, 29; NMFS MSJ at 18-24. The Court previously upheld this interpretation as consistent both with the regulation and with the underlying statute, see Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 481-87, and the Court stands by that analysis.  Consequently, the Court will say no more on that point in this Opinion.

## III.  LEGAL STANDARD

"[W]hen an agency action is challenged[,] [t]he entire case on review is a question of law, and only a question of law."  Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  While the general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to a review of agency action, summary judgment nonetheless "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA

standard of review." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing

Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)); accord Cottage Health Sys. v.

Sebelius, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009).

Under the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The arbitrary and capricious

standard is deferential; it requires that agency action simply be 'reasonable and reasonably

explained.'"  Communities for a Better Environment v. EPA, 748 F.3d 333, 335 (D.C. Cir. 2014)

(quoting Nat'l Telephone Cooperative Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009)); see

also Kennecott Greens Creek Min. Co. v. Mine Safety and Health Admin., 476 F.3d 946, 954

(D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only

reasonableness, not perfection.").  "An agency action will be upheld if the agency 'articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made.'"  FirstEnergy Serv. Co. v. FERC, 758 F.3d 346, 352 (D.C. Cir. 2014) (quoting

Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,

463 U.S. 29, 43 (1983)) (internal quotation marks omitted).  Furthermore, a court will "give an

extreme degree of deference to the agency when it is evaluating scientific data within its

technical expertise." Communities for a Better Environment v. EPA, 748 F.3d at 336 (quoting

City of Waukesha v. EPA, 320 F.3d 228, 247 (D.C. Cir. 2003)) (internal quotation marks

omitted); see also Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997) (a federal court

should "review scientific judgments of the agency 'not as the chemist, biologist, or statistician

that we are qualified neither by training nor experience to be, but as a reviewing court exercising

our narrowly defined duty of holding agencies to certain minimal standards of rationality'") (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc)).

"The Court's review, however, must be 'searching and careful.'"  Colorado River Cutthroat Trout v. Salazar, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Cablevision Sys. Corp. v. FCC, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43); accord Agape Church, Inc. v. FCC, 738 F.3d 397, 410 (D.C. Cir. 2013).  Just as the Court may not "substitute [its] judgment for that of the agency" to set aside an agency action, Rural Cellular Ass'n v. FCC, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also may not "affirm an agency decision on a ground other than that relied upon by the agency."  Manin v. Nat'l Transp. Safety Bd., 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## IV.  DISCUSSION

### A.  Article III Standing

Although NMFS does not challenge Oceana's standing to bring this suit, the issue implicates this Court's subject matter jurisdiction and the Court therefore bears an "independent obligation" to assess it.  See Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006).

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'"  Massachusetts v. EPA, 549 U.S. 497, 516 (2007).  "To enforce this limitation,

9

[federal courts] demand that litigants demonstrate a 'personal stake' in the suit." Camreta v. Greene, 131 S. Ct. 2020, 2028 (2011) (quoting Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009)).  "The party invoking the Court's authority has such a stake when three conditions are satisfied:  The [plaintiff] must show that he has 'suffered an injury in fact' that is caused by 'the conduct complained of' and that 'will be redressed by a favorable decision.'"  Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560-61).

An organizational plaintiff, such as Oceana, "may have standing to sue on its own behalf 'to vindicate whatever rights and immunities the association itself may enjoy' or, under proper conditions, to sue on behalf of its members asserting the members' individual rights." Common Cause v. Fed. Election Comm'n, 108 F.3d 413, 417 (D.C. Cir. 1997) (quoting Warth v. Seldin, 422 U.S. 490, 511 (1975)); see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agriculture, No. 14-5157, 2015 WL 4727327, at *4 (D.C. Cir. Aug. 11, 2015) ("As an organization, PETA 'can assert standing on its own behalf, on behalf of its members or both.'") (quoting Equal Rights Ctr. v. Post Properties, Inc., 633 F.3d 1136, 1138 (D.C. Cir. 2011)).[5] When "an organization sues on behalf of its members, the organization must demonstrate '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  Common Cause v. Fed. Election Comm'n, 108 F.3d at 417 (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).

---

[5]     Oceana asserts each of these forms of standing — "organizational" and "representational."  See Oceana MSJ at 21-22.  Because the Court concludes that Oceana has standing to challenge the BiOp on behalf of several of its members, it does not reach the question whether Oceana would have standing to pursue this action on its own behalf.

Oceana has standing to challenge the BiOp on behalf of its members.  Oceana has proffered declarations from five such members, each of whom states that he or she enjoys observing and/or studying loggerheads and has plans to continue doing so.  See Declaration of Amanda Keledjian [Dkt. No. 37-1] ¶¶ 2, 13-14; Declaration of Emily Fisher [Dkt. No. 37-2] ¶¶ 6-9, 13-15; Declaration of Leslie Westmoreland [Dkt. No. 37-3] ¶¶ 2-7; Declaration of Emily Grantmyre [Dkt. No. 37-4] ¶¶ 3-12, 14-15, 19-20; Declaration of Denise Ryan [Dkt. No. 37-5] ¶¶ 4-11, 13.  They maintain that the BiOp permits an unlawfully excessive amount of harm to loggerheads, which threatens their enjoyment and study of those animals.  Vacating the BiOp and directing NMFS to reinitiate consultation would redress that injury.  These members therefore have standing to sue in their own right.  See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 479-80.  In addition, the members' interests are germane to Oceana's purpose as an ocean conservation group, and their individual participation is not required either by the nature of Oceana's claims or by the relief that it requests, so Oceana has standing to sue on their behalf.

### B.  Cumulative Effects and Aggregate Effects

As it did in its challenge to the Sea Scallop BiOp, Oceana contends that NMFS has failed to take account of (1) cumulative effects and (2) aggregate effects.  See Am. Compl. ¶¶ 73-82; Oceana MSJ at 24-29; Oceana Opp. at 3-11.

### 1.  Cumulative Effects

The term "cumulative effects" is defined in the regulations as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02. In formulating its Biological Opinion, NMFS is obligated to determine "whether the action,

*taken together with cumulative effects*, is likely to jeopardize the continued existence of listed species."  50 C.F.R. § 402.14(g)(4) (emphasis added).  In the present BiOp, NMFS has included a section entitled *Cumulative Effects*, in which it identifies various state and private activities that are anticipated to negatively affect loggerheads in the action area, including:  recreational and commercial fishing in state waters; collisions between turtles and sea vessels; environmental pollution and contaminants; climate change; coastal development; hydroelectric dams; and catastrophic events.  AR 52494-97.  But NMFS states that because it is unable to quantify the future effects of any of these anticipated actions, it has assumed they will be similar to past effects, and therefore considers them to be reflected in anticipated population trends that are presented in other sections of the BiOp.  See id.

        Oceana takes issue with NMFS' approach, arguing that it amounts to a failure to actually consider cumulative effects in the jeopardy analysis.  First, Oceana maintains that NMFS "improperly lumped together its consideration of cumulative effects and its analysis of the status of the species and the environmental baseline [] [r]ather than consider[ing] the separate contribution to jeopardy of cumulative effects."  Oceana MSJ at 25; see also Oceana Opp. at 5-6.  This contention misconceives the agency's explanation of the connection between cumulative effects and the population trends identified in separate sections of the BiOp — specifically, the trends identified in the BiOp's discussions of the "status of the species" and the "environmental baseline."[6]  As NMFS states in the BiOp, the agency lacks sufficient information to quantitatively estimate the number of loggerheads that will be harmed or killed by the state and private activities that cause cumulative effects.  AR 52494-97.  Consequently, NMFS has

---

        [6]        "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

assumed that the future effects of these activities will be similar to their past effects.  Id.  And, because those past effects are reflected in the population trends and trajectories set forth in the *Status of the Species* section of the BiOp, see AR 52318-23, as well as in the *Environmental Baseline* discussion, see AR 52409-17, NMFS concludes that by considering those trends and trajectories in its jeopardy analysis it necessarily has considered cumulative effects.  See AR 52494-97; see also AR 52515 (summarizing jeopardy analysis with reference to the status and trends of the loggerhead population).

Oceana maintains, however, that NMFS did not explain the basis for its assumption that the future effects of state and private activities would be similar to their past effects.  Oceana MSJ at 25; Oceana Opp. at 5-6.  But, as described in the preceding paragraph, the agency stated that it was unable to quantify the magnitude of anticipated future impacts; thus it was left to assume that — in the absence of contrary information — the future effects would be similar to past effects.  The Court concludes that NMFS has articulated a "rational connection" between the absence of data upon which to base quantitative projections of cumulative effects, and its decision to assume that the future effects of state and private activities would be consistent with past levels.  See FirstEnergy Serv. Co. v. FERC, 758 F.3d at 352 (agency must articulate "a rational connection between the facts found and the choice made").

Oceana itself provides no contrary information, nor does it point to available data that NMFS has ignored.  See NMFS Reply at 3 ("Oceana does not argue that this assumption was irrational or [that] there is sufficient scientific evidence available to quantify these future effects.").  Instead, Oceana seems to maintain that the absence of data stems from NMFS' own failure to adequately investigate cumulative effects.  At the very least, Oceana appears to argue, NMFS should have explained why it was unable to offer an assessment of those future effects

13

and instead relied on an assumption of consistency with the past.  See Oceana MSJ at 25 (maintaining that NMFS' assumption was made "without justification (or evidence)," "without investigation or explanation," and "[w]ithout documenting any efforts to gather information on these known cumulative effects").  Oceana's only support for these arguments is to cite guidance appearing in the *Endangered Species Consultation Handbook* ("Handbook"), which explains that "[g]athering information on cumulative effects often requires more effort than merely gathering information on the proposed action," Handbook at 4-32 (AR 45430), and that "[i]nformation on future non-Federal actions can be obtained through observations and inquiries during field reconnaissance in the action area; discussions with State game and fish agencies and other Federal, State, tribal and local agencies, and conservation organizations; and newspapers and other sources of local information (e.g., radio, television, libraries)."  Oceana MSJ at 24 (quoting Handbook at 4-32 (AR 45430)).[7]

Even assuming that NMFS has some obligation to follow the guidance in the Handbook, the cited passage does not by its terms require the agency to undertake any particular data collection activities.  Absent a specific statutory or regulatory mandate, NMFS is under "no obligation to conduct independent studies" to obtain data regarding cumulative effects.  See Southwest Center for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000).[8]

---

[7]       The Handbook was published jointly by NMFS and FWS to offer guidance to those agencies' biologists in their performance of Section 7 consultations.  It is available online at https://www.fws.gov/ENDANGERED/esa-library/pdf/esa_section7_handbook.pdf.

[8]       In Southwest Center for Biological Diversity v. Babbitt, the D.C. Circuit considered a different provision of the Endangered Species Act than that at issue here. Specifically, the Circuit interpreted the requirement that decisions whether to list species as endangered or threatened are to be made "solely on the basis of the best scientific and commercial data available to [the Secretary of the Interior or the Secretary of Commerce] . . . ." 15 U.S.C. § 1533(b)(1)(A).  This language is similar to that governing NMFS' development of the BiOp, which must be made on the basis of "the best scientific and commercial data available."  15 U.S.C. § 1533(a)(2).

Consequently, in the absence of information to support future estimates, NMFS' assumption that future effects would be similar to past effects was a rational one, and Oceana fails to offer any reason or any facts or data of its own to conclude otherwise. And because NMFS has explained how, based on the reasonable assumption it has made, cumulative effects are reflected in the population trends used to conduct the jeopardy analysis, the Court rejects Oceana's contention that those effects were disregarded in the BiOp.

## 2.  Aggregate Effects

Oceana also contends that NMFS "[did not] consider aggregate effects in its jeopardy analysis." Oceana MSJ at 26. As this Court previously has explained, the term "aggregate effects" is not found in the regulations. Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 487. Rather, Oceana draws the term from the Handbook, which states that a jeopardy determination is reached by assessing "whether the aggregate effects of the factors analyzed under [1] 'environmental baseline,' [2] 'effects of the action,' and [3] 'cumulative effects' in the action area — when viewed against the status of the species . . . — are likely to jeopardize the continued existence of the species." Handbook at 4-33 (AR 45431). NMFS agrees that it is "required to evaluate all of these 'aggregate effects' together to reach its 'no jeopardy' conclusion." NMFS MSJ at 13; see also id. at 20.

Oceana's "aggregate effects" argument focuses on the BiOp's reliance on a technical paper called the Population Viability Analysis ("PVA"). The PVA was authored in 2008 by two NMFS scientists, see AR 52646, whose aim was to assess the effect on loggerheads caused by the Sea Scallop Fishery. See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 490-91 (discussing the PVA). In developing the present BiOp, NMFS again considered the PVA and "compar[ed] its results to the current status and trends of the NWA loggerhead DPS." AR

52515.  NMFS concludes that the PVA "supports" its determination that operation of the seven

fisheries will not jeopardize the continued existence of these sea turtles.  Id.

   Oceana advances several attacks on NMFS' use of the PVA.  What all of these

arguments seem to ignore, however, is that the agency's jeopardy analysis does not begin and

end with its reliance on the PVA.  As NMFS explains, the PVA was found to be "informative for

consideration" in the context of this BiOp; it was not the sole ground for the agency's conclusion

that the proposed action would not cause jeopardy.  AR 52515.  The same was true of the Sea

Scallop BiOp, as this Court explained in its Opinion.  See Oceana, Inc. v. Pritzker, 75 F. Supp.

3d at 491 ("[T]he PVA does not constitute the entirety of [the agency's] analysis," as "the

jeopardy determination rests in large part on the qualitative assessment of population indicators

and the estimated extent of Scallop Fishery takes, considered in light of takes occurring in other

fisheries as well as the impact of other sources of harm to loggerheads.").  Similarly here,

NMFS' no-jeopardy determination rests on the same basic assessment of four factors against

which the estimated fishery takes are weighed.  These factors are "the large size of the current

nesting population, the fact that the overall nesting population remains widespread, [that] the

trend for the nesting population appears to be stabilizing and increasing . . . and [that] substantial

conservation efforts have been implemented and are underway to address threats."  AR 52515;

see also Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 489-90 (discussing these same factors as

underlying NMFS' no-jeopardy determination regarding the Sea Scallop Fishery).

   Oceana asserts that NMFS merely compared the effects of the seven fisheries to

the effects of the Sea Scallop Fishery, as opposed to aggregating them.  See Oceana MSJ at

2, 28-29; Oceana Opp. at 9-10; Oceana Supp. Memo. at 5-6.  According to Oceana, "the agency

simply asserted that if the sea scallop fishery legally kills more Loggerheads than each one of the

seven fisheries considered in isolation, then takes caused by the seven fisheries must also fall short of causing jeopardy." Oceana Opp. at 9. This is not an accurate characterization of the BiOp's analysis. The proposed action under review is the continued operation of *all* seven fisheries, not each of the seven fisheries viewed in isolation. See AR 52251, 52508-15. What the BiOp says is that because the PVA supported the conclusion that the Sea Scallop Fishery's 195 lethal takes would not jeopardize the continued existence of loggerheads, it likewise supports the conclusion that the 239 lethal takes caused by these seven fisheries will not cause jeopardy. See AR 52515. There is nothing irrational about this comparison, which, as NMFS emphasizes, comprises only one of the many considerations underlying the BiOp's no-jeopardy determination.

Oceana also argues that the PVA is too outdated to be informative, pointing out that in 2008 when the PVA was run, NMFS' estimate of loggerhead takes in the seven fisheries was only 42, whereas in the present BiOp the estimate has grown to 483 total (non-lethal and lethal) takes. See Oceana MSJ at 27-28. But the PVA was run using actual nesting data, not NMFS' estimates, so this criticism is inapposite. Specifically, the PVA used a set of loggerhead nesting data collected from 1989 to 2005. Oceana further argues that because there are more recent nesting data available, NMFS' reliance on the 2008 PVA was arbitrary and capricious and in violation of the agency's obligation to use the best available scientific and commercial data. See Oceana MSJ at 27-28; Oceana Opp. at 7-8. This argument fails, however, given that NMFS *did* consider these new nesting data in formulating its Biological Opinion. See AR 52515-23, 52508-15. Although NMFS did not run a new PVA using these updated nesting data, it bears reiterating that the PVA was only a supporting player in NMFS' analysis. The agency found the 2008 PVA to be "informative" and to bolster its conclusion — reached on the basis of a broader

qualitative analysis of estimated fishery takes in the context of population-level indicators — that the loggerhead takes occurring in the seven fisheries would not jeopardize the continued existence of the species.  See AR 52515.

Finally, Oceana argues that the PVA's methodology does not comport with the agency's duty to aggregate the effects of the seven fisheries along with the effects of other factors that harm loggerheads.  Specifically, Oceana contends that NMFS should have run a variety of additional iterations of the PVA's statistical model, including iterations combining mortalities from the Sea Scallop Fishery and these seven fisheries, see Oceana MSJ at 28, and iterations comparing loggerhead population trajectories "with and without takes from *each of* the seven fisheries."  See Oceana Opp. at 9 (emphasis added).  Candidly, the Court does not grasp how either of these suggestions would serve Oceana's stated goal of ensuring an "aggregated" analysis of fishery effects.  Both approaches would seem to be vulnerable to the criticism running throughout Oceana's arguments, which is that the effect of these seven fisheries must be evaluated in conjunction with *all* other factors affecting the species.  Of course, the PVA's projection of loggerhead population viability using real data — reflecting all sources of harm to the species — provides a measure of these aggregate effects.

Moreover, Oceana's myopic focus on the PVA overemphasizes its relevance to the no-jeopardy determination presented in this Biological Opinion.  NMFS relied on the PVA as an additional element of support for its determination, rather than as the sole or primary tool undergirding its analysis.  As both Oceana and the agency agree, under the ESA and the Section 7 regulations and in light of the guidance provided by the Handbook, NMFS cannot examine the effects of an action in isolation when determining whether or not those effects jeopardize the continued existence of a species.  Such an analysis would make no sense; the impact on a species

caused by a given number of takes depends on the context in which those takes occur. A species teetering on the brink of extinction may be unable to withstand even the slightest degree of additional harm, whereas a species that, although threatened, enjoys relatively large numbers and a stable population trajectory may be able to absorb a certain level of incidental taking.

In the BiOp, NMFS has concluded that the NWA DPS of loggerheads is the latter type of species, and on the basis of that assessment it has determined that the number of takes caused by the seven fisheries is unlikely to jeopardize the continued existence of this species. Oceana has not explained how either the Endangered Species Act, its regulations, or the scientific community has prescribed a particular quantitative methodology for assessing jeopardy that NMFS has neglected to employ. Cf. Nat'l Ass'n for Surface Finishing v. EPA, Nos. 12-1459, 12-1460, 13-1147, 2015 WL 4450937, at *7 (D.C. Cir. July 21, 2015) ("The statute does not mandate a particular method of cost-benefit analysis. Therefore, we defer to EPA's methodology as well as its ultimate balancing decisions."); Center for Sustainable Economy v. Jewell, 779 F.3d 588, 611 (D.C. Cir. 2015) ("CSE neither identifies in the record, nor itself puts forward, a [quantitative] methodology . . . that is sufficiently established to render arbitrary or irrational Interior's decision to opt instead for a qualitative analysis."). The Court concludes that Oceana's cumulative effects and aggregate effects arguments fail, and that NMFS therefore is entitled to summary judgment with respect to those claims.

### C.  Effects on Loggerhead Recovery

Oceana argues that NMFS' analysis neglects to address the prospects for loggerhead recovery, as opposed to their mere survival, in violation of the agency's own regulation. See Am. Compl. ¶¶ 106-15; Oceana MSJ at 32-33; Oceana Opp. at 10-11, 17. NMFS defines "jeopardize the continued existence of" as meaning "to engage in an action that

reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival *and recovery* of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (emphasis added).  NMFS does not dispute its obligation to consider the likelihood of recovery apart from the likelihood of survival, but maintains that the BiOp does just that.  See NMFS MSJ at 24 n.11; NMFS Reply at 4.

The Court agrees with the agency.  Contrary to Oceana's contention, the BiOp's consideration of recovery is not merely derivative of its analysis of the likelihood of survival. Rather, just as it did in the Sea Scallop BiOp, NMFS has discussed in detail the "recovery plan" for the NWA DPS and the effects of the seven fisheries with respect to various "recovery criteria."  See AR 52510-13; NMFS Supp. Memo. at 3.  Oceana seems to ignore entirely this discussion, instead maintaining that NMFS relied solely on the PVA to reach its conclusion regarding the likelihood of recovery.  See Oceana MSJ at 32-33; Oceana Opp. at 10-11, 17.  The Court is not persuaded by this inaccurate characterization of the BiOp's discussion of recovery, and concludes that NMFS has adequately demonstrated its consideration of loggerhead recovery prospects in reaching its no-jeopardy determination.  See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 485 (upholding sufficiency of NMFS' similar analysis of recovery in the Sea Scallop BiOp). The Court therefore will grant summary judgment to NMFS with respect to Oceana's claim concerning consideration of recovery effects.

### D.  Ten-Year Time Frame

NMFS has limited the BiOp to a term of ten years.  AR 52253, 52442.  Oceana argues that this ten-year limitation is arbitrary and capricious.  Am. Compl. ¶¶ 93-105; Oceana MSJ at 36-38; Oceana Opp. at 21-24.  NMFS responds that Oceana's opposition to the ten-year scope reflects a misunderstanding of the nature of the time restriction.  NMFS MSJ at 26-27;

NMFS Reply at 7.  The Court agrees with the agency that none of Oceana's arguments demonstrates that the BiOp is arbitrary and capricious as a result of its limited term.  The Court further concludes, however, that because NMFS has elected to so limit the BiOp, its analysis of jeopardy can have no applicability to the fisheries' operations beyond that window of time.  Accordingly, NMFS must ensure that on or before December 16, 2023, a new BiOp (or new BiOps) shall be issued for the seven fisheries.

The BiOp explains that the ten-year scope results from an inability to "reliably predict" the nature of the seven fisheries' operation beyond that period of time.  AR 52253.  Specifically, NMFS states that "[a]nticipating that the [seven fisheries] will operate the same way for more than ten years is not only speculative, but the history and pace of change in the fisheries . . . suggests that it is not reasonable to expect these fisheries to continue to operate as they currently do beyond ten years from now."  Id.  Consequently, the BiOp "examines the likely effects of the proposed action on [loggerheads] . . . within the action area to determine if the continued operation of the seven fisheries *over the next ten years* is likely to jeopardize the continued existence of [the] species."  AR 52442 (emphasis added).

Oceana maintains that this approach would allow loggerheads to be gradually pushed toward extinction "in 10-year increments, so long as the effects within any 10-year period [are] sufficiently modest."  Oceana MSJ at 38.  But Oceana misconceives how the 10-year scope affects NMFS' jeopardy analysis.  As NMFS states in the BiOp, although the agency has "determined to limit the scope of the action assessed in [the BiOp] to ten years . . . [NMFS'] analysis of effects does consider impacts of these actions within this ten year time frame that may extend beyond the 10 year time frame."  AR 52253.  Elsewhere in the BiOp, NMFS likewise notes that its jeopardy analysis is aimed at "determin[ing] if the continued operation of

the seven fisheries over the next ten years is likely to jeopardize the continued existence of

[loggerheads] . . . within the next ten years and beyond."  AR 52442.  And in response to

Oceana's comments, NMFS has reiterated that "[i]t is the duration of the action, not the effects

of that action, which is restricted to the 10 year period," and that the agency has "considered the

effects of those 10 years of annual impacts on the species impacted beyond that 10 year period."

AR 52235.

Oceana acknowledges that NMFS claims to have considered the long-term impact

of those fishery takes occurring over the ten-year period, but, in Oceana's view, the agency

merely "pays lip service" to this task.  Oceana MSJ at 36; see also Oceana Opp. at 23.  The Court

disagrees.  As explained supra at 16, the agency has set forth a jeopardy analysis that principally

relies on indicators of loggerhead population size and trajectory, against which the estimated

fishery takes have been measured.  Those population-level indicators are not limited to a ten-year

period, and NMFS' jeopardy determination is not articulated in time-restricted terms.  See AR

52508-15.  Thus, NMFS' jeopardy determination is not equivalent to a mere conclusion that,

within the next ten years, loggerheads will avoid falling into a state of jeopardy.  Rather, its

determination is that the next ten years' worth of takes in these fisheries — amounting to 483

total takes per year in each of those ten years, of which 239 per year will be lethal — are not

likely to jeopardize the continued existence of loggerheads into a longer-term future.

Oceana's argument reflects the same concern that drove the Ninth Circuit, in Wild

Fish Conservancy v. Salazar, 628 F.3d 513, 522-25 (9th Cir. 2010), to conclude that the decision

to limit a Biological Opinion to a five-year term was arbitrary and capricious.  In that case, the

Fish and Wildlife Service had issued a BiOp addressing the impact of a salmon hatchery on the

continued existence of another fish species, the bull trout.  Id. at 516-17.  The BiOp defined the

"action" under review as "the operations and management of the Hatchery for a period of five years." <u>Id</u>. at 521.  The Ninth Circuit reasoned that if a continuing action is broken up into discrete time segments — and the agency's analysis is limited to determining whether the jeopardy threshold will be reached within the next time segment, <u>see id</u>. at 522-23 — "a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest." <u>Id</u>. at 523 (quoting <u>Nat'l Wildlife Federation v. NMFS</u>, 524 F.3d 917, 930 (9th Cir. 2007)).  But this admittedly troubling approach has not been employed by NMFS in the BiOp at issue here.  As the Court has explained, the specific question answered by this BiOp is whether adding the next ten years' worth of takes into the mix will be likely to jeopardize the continued existence of loggerheads over the longer term.  The valid concern raised by the court in <u>Wild Fish Conservancy</u> therefore is not implicated in the present case.  Instead, NMFS' approach would be better characterized by Judge Fisher's observation, in dissent, that "[a] BiOp addressing a fixed term of operations can and must address long-term implications." <u>Id</u>. at 534. This is exactly what NMFS has done in the present BiOp.

　　　　　　With that said, the Ninth Circuit majority did raise another question that seems to have more purchase in these circumstances, namely whether by circumscribing review of a continuing action — such as the operation of the seven fisheries here — an agency thereby fails to prepare a "comprehensive biological opinion" that evaluates the effects of the "entire agency action." <u>Wild Fish Conservancy v. Salazar</u>, 628 F.3d at 522 (quoting <u>Conner v. Burford</u>, 848 F.2d 1441, 1453-54 (9th Cir. 1988)).  The court in <u>Wild Fish Conservancy</u> found unconvincing FWS' contention that "the five-year term of operations and management [*was*] the entire agency action," an argument that ignored the fact that "the Hatchery has been operating for seventy

years and is expected to continue operating into the future." Id.  According to the court, FWS

"might as easily have chosen a thirty-year term or a one-year term." Id.

Oceana draws on this theme, arguing that "[b]y authorizing the seven fisheries to

operate indefinitely," NMFS was required to define the action in a manner that aligns with this

indefinite scope. See Oceana Opp. at 22.  But the court in Wild Fish Conservancy also

acknowledged that an agency managing an ongoing action might sometimes find "future

operations [to be] so unpredictable[] that the consulting agency would be justified in preparing a

short-term biological opinion."  628 F.3d at 524 n.9.  This is the justification that NMFS has

invoked in the present case, relying on its expert judgment, and Oceana has not demonstrated

that this rationale is unreasonable.  Moreover, as the Court has observed, NMFS has considered

in its jeopardy analysis the longer-term impacts of the next ten years' worth of loggerhead takes.

See AR 52508-15.  Oceana has not explained how such an approach might be unworkable or

unsound, provided that the agency does not neglect to conduct, at an appropriate point in the

future, a new jeopardy analysis addressing the impact of takes occurring beyond the ten-year

mark.  Oceana seems to suggest instead that NMFS should assume a constant rate of loggerhead

takes occurring in the fisheries, and that the agency therefore should project that the current

estimated take levels will continue indefinitely.  See Oceana MSJ at 37; Oceana Opp. at 22-24.

But Oceana's suggestion that such an approach is the only rational method of analysis fails to

persuade; the agency's decision to choose otherwise is not unreasonable and therefore merits

deference.

Oceana further argues that NMFS' application of a ten-year scope is a departure

from its prior practice, given that the 2010 BiOps addressing the same seven fisheries did not

include this limitation.  Oceana MSJ at 37; see also Am. Compl. ¶ 99; Oceana Opp. at 22 & n.15.

NMFS responds that such a departure is not arbitrary and capricious so long as the agency offers a rational explanation for its choice. NMFS Reply at 8; see Home Care Ass'n of America v. Weil, No. 15-5018, 2015 WL 4978980, at *10 (D.C. Cir. Aug. 21, 2015) (under APA, courts "ask whether actions that are a departure from prior agency practice . . . rest on a 'reasoned explanation'") (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009)). Again, NMFS' stated rationale for limiting the proposed action to only the next ten years of the fisheries' operation is the agency's inability to reliably predict how the fisheries will operate beyond ten years. As the Court has explained, this reason is rational, and NMFS has not limited its analysis to simply determining whether the jeopardy threshold will be reached within the next ten years. NMFS' departure from its prior practice does not render the present BiOp arbitrary and capricious.

Finally, Oceana argues that the "best available science" would require NMFS to issue a Biological Opinion with a term of 100 years, rather than ten years. Oceana cites the *Red List Categories and Criteria* developed by the International Union for Conservation of Nature ("IUCN"), which, Oceana maintains, is "an internationally accepted scientific reference for evaluating the status of species." Oceana MSJ at 37 n.27; see also Am. Compl. ¶¶ 96-98; Oceana Opp. at 23-24. According to the IUCN, when determining whether a species is "critically endangered," scientists should analyze population size changes over a period of ten years or three generations, whichever is the longer, up to a maximum of 100 years. See IUCN Species Survival Comm'n, IUCN Red List Categories and Criteria, at 16 (Version 3.1, 2d ed. Feb. 9, 2000) [Dkt. No. 37-7]. Oceana argues that because the agency defines a loggerhead generation as being 50 years long, NMFS was obligated to employ a term of 100 years in performing its jeopardy analysis. Oceana MSJ at 37; Oceana Opp. at 23-24. When Oceana

advanced this contention in comments offered to NMFS, the agency responded that "[t]he IUCN

criteria are not directly relevant to the [BiOp]."  AR 52235.  As noted above, the criteria Oceana

cites relate specifically to categorizing species as "critically endangered"; whatever relevance

these criteria might have with respect to performing a jeopardy determination — which is a

creature unique to the Endangered Species Act — is up to the agency to decide.  NMFS' decision

to limit its opinion to a ten-year term therefore is not arbitrary and capricious.

       An obvious consequence of the agency's decision to employ a ten-year time

frame, however, is that upon the expiration of ten years from the date of issuance of this BiOp —

December 16, 2013 — the BiOp's analysis will have reached the extent of its applicability, and

the continued operation of the seven fisheries beyond that point will fall outside the purview of

the Section 7 consultation at issue in this case.  Although NMFS states that it "expects that [the

agency] will have to evaluate whether there is a need to reinitiate consultation on the seven

fisheries at some point in the next ten years," AR 52253, this expectation is not equivalent to a

firm legal commitment.  Since NMFS has chosen to issue a limited-term BiOp, it must ensure

that, at the expiration of the ten-year term, a new BiOp (or, possibly, several new BiOps) are in

place with respect to the seven fisheries at issue in this case.  Furthermore, if conditions in the

fisheries change to the extent anticipated by NMFS even before the passage of ten years, the

agency will be obligated to reinitiate consultation at that time.  See 50 C.F.R. § 402.16(c)

("Reinitiation of formal consultation is required . . . [i]f the identified action is subsequently

modified in a manner that causes an effect to the listed species or critical habitat that was not

considered in the biological opinion.").

*E.  Climate Change*

Oceana's next challenge focuses on the BiOp's treatment of the issue of climate change.  Am. Compl. ¶¶ 128-33; Oceana MSJ at 38-43; Oceana Opp. at 24-28.  Oceana argues that NMFS has refused to adequately consider the impact that climate change will have on the NWA DPS of loggerheads, rendering the agency's analysis arbitrary and capricious.

The BiOp's discussion of climate change bears some similarity to that featured in the Sea Scallop BiOp, which this Court previously reviewed.  There, the Court determined that NMFS had shown sufficient consideration of climate change in reaching its jeopardy determination.  See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 491-93.  The Court rejected Oceana's primary argument, namely that NMFS had impermissibly failed to evaluate the anticipated long-term effects of climate change on the survival and recovery of loggerheads.  Upon review of the Sea Scallop BiOp, the Court determined that NMFS had demonstrated its consideration of these effects, and found that the agency's failure to offer precise projections of climate change impacts on loggerheads was adequately explained by a lack of scientific information.  See id. at 492-93.  In addition, the Court recognized that although NMFS had "articulated its conclusion regarding climate change in the context of a ten-year time frame," the BiOp "nonetheless discusse[d] the long-term impact of climate change."  Id. at 493.  Finally, the Court rejected Oceana's contention that the Sea Scallop BiOp's climate change discussion was incompatible with the Population Viability Analysis relied upon in the agency's analysis of jeopardy, finding that "there is no necessary discord in using the PVA's predictions at the 100-year mark to inform a jeopardy analysis that, at least with respect to climate change, is expressed by reference to predicted effects within the next ten years."  Id.

Oceana invokes some of these same themes in its challenge to the present BiOp. For example, Oceana again argues that NMFS has wholly disregarded the long-term effects of climate change on loggerheads.  See Oceana MSJ at 38, 41-43; Oceana Opp. at 24, 27-28. Oceana accuses the agency of impermissibly relying on scientific uncertainty regarding potential climate change impacts, arguing that the uncertain state of the science does not excuse a failure to consider and evaluate those impacts.  See Oceana MSJ at 41.  And Oceana contends that NMFS' emphasis on evaluating the effects of climate change only over the next ten years lays bare an assumption that no such effects will occur beyond that period of time.  See id. at 41-43.

Oceana accurately observes that NMFS has emphasized the short-term over the long-term, an emphasis that is manifest in the BiOp's ultimate conclusion that "it is unlikely that climate related impacts will have a significant effect on the status of [loggerheads] in the short-term future (i.e., over the next decade or so)."  AR 52497; see also id. at 52438 ("In the next ten years, the expected small increase in temperature is unlikely to cause a significant effect to sea turtles . . . ."); id. at 52432 ("We will primarily consider the effects of climate change on the listed species over the next ten years."); NMFS MSJ at 29 ("NMFS ultimately limited its analysis of climate change to ten years.").

But Oceana overstates the case when it accuses the agency of thereby "assuming no impact from climate change" in performing the jeopardy analysis.  See Oceana MSJ at 42.  As with the Sea Scallop BiOp, here the agency considered the available science concerning the potential long-term impacts of climate change on loggerheads, and offered fairly extensive discussion of the possibilities suggested by this science, including "increasing temperatures, sea level rise, changes in ocean productivity, and increased frequency of storm events," which could contribute to habitat loss and lead to negative effects on loggerheads' nesting behavior, with

consequent impacts on reproduction.  AR 52434.  In addition, NMFS observed that because loggerheads "exhibit temperature-dependent sex determination[,] [r]apidly increasing global temperatures may result in warmer incubation temperatures and highly female-based sex ratios." Id.  And according to NMFS, climate change might also affect the availability and distribution of prey, such as shellfish, on which loggerheads feed.  See id.

The agency ultimately concluded, however, that it lacked the ability to offer more definite projections of these effects.  See AR 52432 ("Longer-term effects of the fishery and climate change . . . are speculative and difficult to extrapolate beyond ten years.").  A lack of precision, however, does not necessarily mean that NMFS has failed to "address[] the long-term effects [on] Loggerheads at all."  Oceana Opp. at 24.  In this case, a comprehensive reading of the BiOp demonstrates that the agency did address long-term effects, yet found them to be too indeterminate to yield clearly articulable conclusions.  And Oceana has neither pointed to relevant data that was ignored, nor has it explained how NMFS might have more thoroughly analyzed or "modeled" the available data, as Oceana asserts would be possible.  See Oceana MSJ at 42.  The Court therefore concludes that NMFS' analysis is not arbitrary and capricious for a purported failure to consider the long-term effects of climate change on loggerheads.

But Oceana also advances an argument that is aimed at NMFS' consideration of the short term — an argument not made in its prior challenge to the Sea Scallop BiOp — which the Court finds persuasive.  Oceana points out that NMFS justifies its short-term focus by relying on the scientific uncertainty about long-term effects, yet, at the same time, discounts the likelihood of short-term effects by maintaining that climate change is occurring on a "century scale."  See Oceana MSJ at 39-41 (citing AR 52497).  As Oceana accurately states, however, the agency's reliance on the purported "century scale" of the effects of climate change shows that

NMFS failed to take full account of the record evidence of short-term effects caused by climate change.  Indeed, the BiOp describes clear evidence that climate change is exerting significant environmental impacts right now, as well as evidence that these impacts will persist or accelerate in the immediately approaching decades.  See AR 52430 (noting temperature rise and "observed changes in marine systems" that have occurred "over the past few decades"); id. at 52431 ("A warming of about 0.2°C (0.4°F) per decade is projected for the next two decades . . . ."); id. ("Warming is very likely to continue in the U.S. over the next 25 to 50 years . . . .  It is very likely that the magnitude and frequency of ecosystem changes will increase in the next 25 to 50 years, and it is possible that changes will accelerate.").  The specific reasoning set forth by NMFS — that the effects of climate change will be seen primarily on a century scale — seems to ignore this evidence and therefore cannot support the agency's conclusion that "it is unlikely that climate related impacts will have a significant effect on the status of . . . sea turtles . . . in the short-term future."  AR 52497.

  To be sure, NMFS recognizes shorter-term projections of temperature increase, while maintaining that the effects of this increase are not known.  See AR 52437 ("Over the time period of this action considered in this Opinion, sea surface temperatures are expected to rise less than 1°C.  It is unknown if that is enough of a change to contribute to shifts in the range or distribution of sea turtles.").  What the BiOp does not include, however, is sufficient explanation of the link between the substantial evidence of significant short-term climate change effects, which the BiOp acknowledges, and the agency's ultimate conclusion that any short-term impacts on loggerheads will be negligible.  See FirstEnergy Serv. Co. v. FERC, 758 F.3d at 352 (agency must articulate a "satisfactory explanation for its action including a rational connection between the facts found and the choice made").  In particular, the BiOp does not explain how its

conclusion is a reasonable one in view of the potential short-term impacts caused by sea-level

rise, which is expected to "result in increased erosion rates along nesting beaches."  AR 32563

(2008 Recovery Plan) (cited at Oceana MSJ at 40 n.29; Oceana Opp. at 25 n.17).  The relevance

of sea-level rise as a factor affecting loggerheads in the present and near-term future — and the

consequent need for the agency to provide further explanation — is reinforced by a "recent study

by the U.S. Geological Survey [finding] that sea levels in a 620-mile 'hot spot' along the East

Coast are rising three to four times faster than the global average."  AR 52438.  The Court

therefore will remand the BiOp to NMFS so that it can more clearly explain the connection

between the record evidence of present and short-term effects caused by climate change, and the

agency's conclusion that climate change will not result in any significant effects on the species in

the short-term future.  See Tripoli Rocketry v. Bureau of Alcohol, Tobacco, Firearms, and

Explosives, 437 F.3d 75, 84 (D.C. Cir. 2006) (remanding for further explanation); Tex Tin Corp.

v. U.S. EPA, 935 F.2d 1321, 1324 (D.C. Cir. 1991) (per curiam) (same).

### F.  Incidental Take Statement

Finally, Oceana challenges the BiOp's Incidental Take Statement ("ITS").  An

ITS is required where, as here, NMFS concludes that the proposed agency action will not

jeopardize a species' continued existence, yet will cause some takes incidental to the action.

16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); Arizona Cattle Growers' Ass'n v. U.S. Fish &

Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1241-42 (9th Cir. 2001).  Thus, the BiOp's ITS

sets forth the permissible "impact on the species" as expressed by the "incidental take" of

loggerheads in the NWA DPS.  See 16 U.S.C. § 1536(b)(4).  NMFS estimates that, on an annual

basis in the seven fisheries, 269 loggerheads will be taken by gillnet gear, of which up to 167

takes may be lethal; 213 loggerheads will be taken by bottom trawl gear, of which up to 71 takes

may be lethal; and up to one loggerhead will be taken by trap/pot gear, which may or may not be lethal.  AR 52543.  In the ITS, those numbers constitute limits on the number of loggerhead takes that can occur in the fisheries annually.  The ITS thereby provides a safe harbor that exempts the specified amount of incidental taking from the take prohibition set forth in Section 9 of the ESA.  See 16 U.S.C. § 1536(o)(2).  If the allowable level of incidental take is exceeded, however, the agency is "required" to reinitiate Section 7 consultation "immediately."  50 C.F.R. §§ 402.14(i)(4), 402.16(a).

   Oceana argues that the ITS does not sufficiently explain how NMFS will monitor whether the take limits have been exceeded.  The Court agrees with Oceana.  The ITS suffers from the same inadequacies that were present in the Sea Scallop ITS with respect to its provisions for trawl take monitoring, which led the Court to remand to NMFS for further consideration or explanation of its monitoring methodology for that component of the Scallop Fishery.  See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 497-99.  Specifically, the present ITS states that NMFS will produce new loggerhead take estimates every five years, rather than each year.  AR 52548.  But as the Court explained in its earlier Opinion, "NMFS is required under its own regulations to reinitiate Section 7 consultation 'immediately' if 'during the course of the action the amount or extent of incidental taking . . . is exceeded.'"  Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 498 (quoting 50 C.F.R. § 402.14(i)(4)); see also 50 C.F.R. § 402.16(a).  It is not clear how the agency can discharge its responsibility to reinitiate Section 7 consultation "immediately" once an annual take limit has been exceeded, when take estimates are produced no more frequently than every five years.  See Oceana Opp. at 30.  Although the Court is not prepared to hold that a five-year monitoring cycle is *per se* arbitrary and capricious, there is apparent "tension" between the regulatory mandate and the infrequency with which NMFS measures take

estimates against the take limit, see Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 498-99, and this dissonance places an onus on the agency to adequately explain the reasonableness of its approach.

NMFS maintains that its ability to produce take estimates is constrained by "data needs; length of time to develop, review, and finalize the estimates; and methodology used."  AR 52548.  But this statement leaves far too much unexplained.  There are no details provided to elucidate the nature of NMFS' statistical methods and the data needs of those methods.  Nor does NMFS offer any indication that it has considered alternative methodologies or techniques that might produce take estimates on a shorter timeline.  In particular, NMFS does not explain why data collection cannot be expanded through the placement of additional at-sea observers on fishing vessels, despite the agency's own acknowledgement that "[o]bserver coverage [is] the primary means of collecting incidental take information."  AR 52548.  On this point, Oceana argues that "the agency creates a problem of no data by refusing to monitor with at-sea observers who could collect that data, and then uses the lack of data to say that it cannot have a trigger to timely reinitiate consultation."  Oceana MSJ at 45.  NMFS counters by asserting that "Oceana has not shown that adding more observers . . . will result in take estimates . . . which can be complied more frequently."  NMFS MSJ at 33; NMFS Supp. Memo. at 7 n.2.

Based on the evidence already in the record, it would seem that increasing observer coverage will lead to the collection of more data, addressing the "data needs" that NMFS claims are a source of delay in its development of take estimates.  On the other hand, as this Court has acknowledged, it could be that external constraints limit NMFS' ability to add more observers to fishing vessels.  See Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 498 (recognizing that "[t]he five-year timetable may reflect very real limitations on NMFS' data

collection capabilities").  Still, by neglecting to directly address this commonsense solution to its

data need problems, which could potentially reduce the delay in developing take estimates,

NMFS cannot rely on a lack of data to justify the infrequency of its ability to generate take

estimates that can be compared against the annual take limits set forth in the ITS.

       NMFS also contends that Oceana ignores the fact that the agency develops

monthly and annual summaries of observed loggerhead takes, see AR 52546, and that NMFS has

committed to performing an annual "review [of] observed takes of loggerhead turtles to consider

trends in takes and look for patterns and changes in take levels."  AR 52548; see NMFS MSJ at

32.  The Court agrees with Oceana's response to this argument:  "[a]lthough the Fisheries

Service committed to 'look for trends' in the available data at least once per year, the agency

committed to generating an actual take estimate (that could be compared to the take estimates in

the Batched BiOp) only once every five years."  Oceana Opp. at 29; see also Oceana Supp.

Memo. at 7.  Stated differently, if NMFS asserts that it needs five years' worth of data to

estimate annual take levels, see AR 52548, then how can monthly and annual reports of observed

takes usefully be compared against the annual take limits established in the ITS?  If there is a

rational response to this question — that is, an explanation as to how the monthly and annual

take reports can be used to determine whether an annual take limit has been exceeded — NMFS

must provide it.  See also Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 499 n.21 (questioning the

same assertion, made by NMFS in connection with monitoring of scallop trawl fishery).

       Although NMFS maintains that this explanation already has been supplied by the

agency's response to Oceana's comments, see NMFS Supp. Memo. at 6-7, the Court disagrees.

The agency merely reiterates its assertion that loggerhead takes are "documented monthly," AR

52236A, and that NMFS will perform a review of those takes at least once per year.  Id.; AR

52235A.  Moreover, the agency's response explicitly concedes that "the comparison of the estimated number of loggerhead interactions can be conducted every five years when a new [take] estimate is generated."  AR 52235A.  It is this comparison that enables the ITS to provide for "a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation."  Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 496 (quoting Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d at 1249).

The Court therefore will remand the BiOp to NMFS so that it can provide further explanation regarding the sufficiency of its monitoring mechanisms.

## V.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Oceana's motion for summary judgment, and it will grant in part and deny in part NMFS' cross-motion for summary judgment.  The Court will remand this matter to NMFS so that the agency can address the concerns raised by the Court in this Opinion.  But the Court rejects Oceana's request to vacate the BiOp, given the fair possibility that NMFS will be able to justify its choices "through more thorough and informative explanation."  Oceana, Inc. v. Pritzker, 75 F. Supp. 3d at 499.  An appropriate Order accompanies this Opinion.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  August 31, 2015