UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                              )
OCEANA, INC.,                                 )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )      Civil Action No. 12-0041 (PLF)
                                              )
WILBUR ROSS,                                  )
United States Secretary of Commerce, et al.,  )
                                              )
            Defendants.                       )
———————————————————————— )

OPINION

        This matter comes before the Court on defendants' notice that the National

Marine Fisheries Service has revised its Incidental Take Statement, thus completing its remand

in response to the Court's August 31, 2015 Opinion and Order.  Plaintiff Oceana, Inc. filed a

response to the notice, challenging the adequacy of the agency's revisions on remand, and the

parties proceeded to brief the matter.  Upon consideration of the revised Incidental Take

Statement, the parties' briefs and representations at oral argument, the relevant legal authorities,

and the entire record in this case, the Court will enter final judgment in this case for the

defendants.[1]

_____

        [1]        In reaching its decision, the Court has reviewed the following filings, including
the exhibits attached thereto:  Notice of Lodging Joint Appendix of Administrative Record
Material ("AR") [Dkt. No. 46]; Defendants' Notice of Completion of Remand ("Notice of
Completion") [Dkt. No. 55]; Defendants' Notice of Filing Supplemental Administrative Record
("SAR") [Dkt. No. 56]; Oceana's Response to Notice of Completion of Remand ("Oceana
Response") [Dkt. No. 58]; Defendants' Response in Support of Notice of Completion of Remand
("NMFS Response") [Dkt. No. 59]; Oceana's Reply to Notice of Completion of Remand
("Oceana Reply") [Dkt. No. 60]; Defendant's Corrected Notice of Reinitiation of Consultation

I. STATUTORY AND REGULATORY FRAMEWORK

In its 2015 Opinion, the Court described the relevant statutory and regulatory framework and recounted the factual and procedural history of this case.  See Oceana, Inc. v. Pritzker, 125 F. Supp. 3d 232, 235-39 (D.D.C. 2015).  The Court thus recites here only those matters relevant to resolving the parties' instant dispute.

The Endangered Species Act ("ESA") of 1973, as amended, 16 U.S.C. § 1531 et seq., created a comprehensive legislative and regulatory scheme that seeks to preserve and protect species of animals facing man-made threats to their continued existence.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 558 (1992); Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  As part of this scheme, Section 7 of the ESA sets forth "the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora."  See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 652 (2007).  In particular, Section 7(a)(2) requires that each federal agency, "in consultation with and with the assistance of [the National Marine Fisheries Service ("NMFS") or the U.S. Fish and Wildlife Service ("FWS")], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ."  See 16 U.S.C. § 1536(a)(2). [2]

_____

("Notice of Reinitiation") [Dkt. No. 62]; and Oceana's Response and Opposition to Notice of Reinitiation of Consultation ("Oceana Resp. to Notice") [Dkt. No. 63].

[2]      FWS and NMFS jointly administer the ESA.  See 50 C.F.R. § 402.01(b).  FWS administers the statute with respect to species under the jurisdiction of the Secretary of the Interior, while NMFS covers those species under the jurisdiction of the Secretary of Commerce.  See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. at 651.  The agency whose action is at issue is known as the "action agency," while either FWS or NMFS serves as the "consulting agency."  See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 924 (9th Cir. 2008).  In this case, NMFS serves as both the "action agency" and the

The Section 7 consultation process culminates in the issuance of a Biological Opinion, or BiOp, in which the consulting agency sets forth its "opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  See 16 U.S.C. § 1536(b)(3)(A); see also 50 C.F.R. § 402.14(h).  Where the consulting agency concludes that the agency action is not likely to jeopardize the continued existence of the species but is nonetheless likely to result in some "incidental take," the BiOp must include an Incidental Take Statement ("ITS") specifying the permissible extent of this impact on the species.  See 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  The ITS must set forth conditions that include "reasonable and prudent measures" considered "necessary or appropriate to minimize" the impact of any incidental takings.  See 50 C.F.R. § 402.14(i)(1)(ii).[3]  And if the amount or extent of incidental taking ever exceeds that specified in the ITS, the action agency must reinitiate Section 7 consultation "immediately."  See 50 C.F.R. § 402.14(i)(4); see also 50 C.F.R. § 402.16(a).  As a result, incidental take monitoring is a key component of any ITS – without the ability to monitor incidental takes, these regulatory requirements become meaningless.

---

"consulting agency."  NMFS' Sustainable Fisheries Division of its Northeast Regional Office administers the fisheries management program governing the seven fisheries, which makes it the action agency here.  Am. Compl. ¶ 22; see AR 52237, 52243.  The Protected Resources Division of the same Regional Office served as the consulting agency and authored the Biological Opinion.  Am. Compl. ¶ 21; see AR 52337, 52243.

[3]    As defined by the ESA, to "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  See 16 U.S.C. § 1532(19).  Although Section 9 of the ESA generally prohibits any taking of a listed species, see 16 U.S.C. § 1538(a)(1), incidental takes are permissible if they occur in accordance with the conditions set forth in an ITS, see 50 C.F.R. § 402.14(i)(5).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

At issue in the present case is a Biological Opinion ("BiOp"), issued by NMFS on December 16, 2013, that addresses the impact of seven fisheries on the Northwest Atlantic Distinct Population Segment ("NWA DPS") of loggerhead sea turtles.  Oceana, Inc. ("Oceana"), an international advocacy group focused on ocean conservation, filed a complaint challenging the BiOp for a variety of reasons.  See Amended Complaint [Dkt. No. 33].  On August 31, 2015, this Court issued an opinion granting in part and denying in part the parties' cross-motions for summary judgment and, in turn, remanding the case to the agency for the limited purpose of addressing two deficiencies in the 2013 BiOp.  See Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 252, 255.

First, the Court remanded with regard to the BiOp's treatment of climate change in its jeopardy analysis.  See Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 250-52.  The Court directed the agency to "more clearly explain the connection between the record evidence of present and short-term effects caused by climate change, and the agency's conclusion that climate change will not result in any significant effects on the species in the short-term future." Id. at 252.  The BiOp had "discount[ed] the likelihood of short-term effects by maintaining that climate change is occurring on a 'century scale.'"  Id. at 251 (citing AR 52497).  On a high-level, the Court found that this explanation "failed to take full account of the record evidence of short-term effects caused by climate change" because the BiOp described "clear evidence that climate change is exerting significant environmental impacts right now, as well as evidence that these impacts will persist or accelerate in the immediately approaching decades."  Id. at 252.

Specifically, the Court took issue with the agency's conclusions in the BiOp pertaining to warming temperatures and rising sea levels.  The record included evidence that temperature rise was already occurring and would "persist or accelerate in the immediately

approaching decades." Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 252 (citing to places in the administrative record that described both recent and upcoming temperature rise).  NMFS maintained that the "effects of this [temperature] increase are not known." Id.  Thus, the Court held that the agency had failed to sufficiently explain the "link between the substantial evidence of significant short-term climate change effects" and "the agency's ultimate conclusion that any short-term impacts on loggerheads will be negligible." Id.  Similarly, the BiOp included evidence of sea-level rise, which is "expected to result in increased erosion rates along nesting beaches," including a "620-mile 'hot spot' along the East Coast" where sea levels are "rising three to four times faster than the global average." Id. (citing AR 32563, 52438).  Again, the Court said that this evidence required the agency to "provide further explanation" for its "conclusion that climate change will not result in any significant effects on [loggerheads] in the short-term future." Id.

        The second issue that the Court instructed NMFS to address on remand was the "sufficiency of its monitoring mechanisms." Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 255. The BiOp's ITS set forth the permissible "impact on the species," estimating that, "on an annual basis in the seven fisheries, 269 loggerheads will be taken by gillnet gear . . . 213 loggerheads will be taken by bottom trawl gear . . . and up to one loggerhead will be taken by trap/pot gear . . . ." Id. at 253 (citing AR 52543).  While the ITS established annual numerical take limits, the monitoring mechanism stated that NMFS would produce a new loggerhead take estimate every five years. Id. (citing AR 52548).  Without holding that a five-year monitoring cycle is per se arbitrary and capricious, the Court noted that it was "not clear how the agency can discharge its responsibility to reinitiate Section 7 consultation immediately once an annual take limit has been exceeded, when take estimates are produced no more frequently than every five

years," and therefore, "this dissonance places an onus on the agency to adequately explain the reasonableness of its approach." Id. The Court specifically noted that the agency's defense of its five-year monitoring mechanism – that it was constrained by data needs – "leaves far too much unexplained." Id. The Court added that NMFS neglected to address why it could not simply increase observer coverage in order to collect more data to develop take estimates – a "commonsense solution to its data problems" – given that the record indicated that "observer coverage is the primary means of collecting incidental take information." Id. at 253-54 (alterations omitted) (citing AR 52548). The Court also asked NMFS to better explain how the monthly and annual take reports described in the ITS could be useful in determining whether an annual take limit had been exceeded when the agency said that it needs five years' worth of data to estimate annual take levels. Id. at 254.

NMFS revised the BiOp and now contends that it has completed its required task on remand by more thoroughly addressing the deficiencies that the Court had identified. See Notice of Completion. Oceana filed a response arguing that the revised BiOp remains defective and, as a result, NMFS has failed to comply with the Court's directives on remand. See Oceana Response.

III. LEGAL STANDARD

A BiOp constitutes final agency action subject to judicial review under the Administrative Procedure Act. See Bennett v. Spear, 520 U.S. 154, 177-78 (1997). "[W]hen a party seeks review of agency action under the APA . . . the district judge sits as an appellate tribunal." Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). The general standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to a review

of agency action.  Summary judgment nonetheless "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  Sierra Club v. Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citing Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)); accord UPMC Braddock v. Harris, 934 F. Supp. 2d 238, 245 (D.D.C. 2013); Cottage Health Sys. v. Sebelius, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009).  In other words, "[t]he entire case on review is a question of law."  Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is deferential; it requires that agency action simply be 'reasonable and reasonably explained.'"  Cmtys. for a Better Env't v. EPA, 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting Nat'l Telephone Cooperative Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009)); see also Kennecott Greens Creek Min. Co. v. Mine Safety and Health Admin., 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only reasonableness, not perfection.").  "[A] court is not to substitute its judgment for that of the agency" if the agency "examine[d] the relevant data and "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  Airmotive Eng'g Corp. v. Fed. Aviation Admin., 882 F.3d 1157, 1159 (D.C. Cir. 2018) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).

Furthermore, a court will "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." Cmtys. for a Better Env't v. EPA, 748 F.3d at 336 (quoting City of Waukesha v. EPA, 320 F.3d 228, 247 (D.C. Cir. 2003)) (internal quotation marks omitted).  A court must remain mindful that it reviews an agency's scientific judgments "not as the chemist, biologist, or statistician that [the court is] qualified neither by training nor experience to be," and thus it may exercise only the "narrowly defined duty of holding agencies to certain minimal standards of rationality." Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc)).

"The Court's review, however, must be 'searching and careful.'" Colorado River Cutthroat Trout v. Salazar, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting Nat'l Envtl. Dev. Assn's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Cablevision Sys. Corp. v. FCC, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43); accord Agape Church, Inc. v. FCC, 738 F.3d 397, 410 (D.C. Cir. 2013).  Just as the Court may not "substitute [its] judgment for that of the agency" to set aside an agency action, Rural Cellular Ass'n v. FCC, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also may not "affirm an agency decision on a ground other than that relied upon by the agency." Manin v. Nat'l Transp. Safety Bd., 627 F.3d 1239, 1243 (D.C. Cir. 2011).

In addition, where an administrative agency has been ordered to reconsider or explain an earlier decision on remand, as is the case here, the agency has an "affirmative duty to respond to the specific issues remanded" by the Court.  See Defs. of Wildlife v. Kempthorne, No. 04-1230, 2006 WL 2844232, at *12 (D.D.C. Sept. 29, 2006) (first citing Tex Tin Corp. v. Envtl. Prot. Agency, 992 F.2d 353, 355 (D.C. Cir. 1993); then citing Ass'n of Civilian Technicians v. Fed. Labor Relations Auth., 370 F.3d 1214, 1223 (D.C. Cir. 2004)).  The agency "retains some discretion to determine how it 'may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops.'"  See id. at *11 (quoting Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp., 423 U.S. 326, 333-34 (1976)).  And the remanding court "may not dictate to the agency the 'methods, procedures, [or] time dimension,' for its reconsideration."  See id. (alteration in original) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).  Nor may the court demand that an agency reach any particular result.  See id. (citations omitted).  But the Court retains jurisdiction to enforce the terms of its remand order where the agency does fail to adequately respond.  See id. at *12 (citing Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Occupational Safety & Health Admin., 976 F.2d 749, 750 (D.C. Cir. 1992)).

## IV. ANALYSIS

### A.  Notice of Reinitiation of Consultation

The Court will first address a threshold issue raised about mootness.  On October 20, 2017, NMFS filed a notice of reinitiation of consultation.  See Notice of Reinitiation.  In this notice, NMFS explained that the agency had reinitiated consultation (1) based on new information indicating that the number of North Atlantic right whales had been in decline since 2010, and (2) because the reinitiation trigger in the 2013 BiOp for large whales had been

exceeded.  See id. at 3.  NMFS said that during this reinitiated consultation process it would also review new information on other listed species that had become available since the 2013 BiOp, including information regarding sea turtles and impacts from the seven fisheries.  See id.  In its notice, NMFS explained that once the reinitiated consultation was complete, the new BiOp would supersede the 2013 BiOp and render moot any remaining claims challenging that opinion. See id.

Oceana filed a response to the agency's notice.  See Oceana Resp. to Notice. Oceana noted that NMFS had neither withdrawn the 2013 BiOp nor suspended the operation of the seven fisheries while the agency reinitiated consultation.  See id. at 3-4.  It argued, therefore, that the reinitiation of consultation did not render Oceana's litigation challenging the 2013 BiOp moot.  See id.  But Oceana's argument misunderstands the agency's representations in its notice. NMFS has not argued that the case is currently moot; only that it would become moot once a new, superseding BiOp is issued.  See Notice of Reinitiation at 3.  The Court has not received any notice that the NMFS has completed its reinitiation of consultation and issued a new BiOp that would supersede the 2013 BiOp.  The parties are thus in agreement that, at present, this case is not moot.  Issues remain in this case for the Court to resolve – particularly, whether NMFS has responded adequately to the specific issues previously remanded by the Court.

## B.  Short-Term Effects of Climate Change

When the Court remanded this matter to the agency, it instructed the agency to "more clearly explain the connection between the record evidence of present and short-term effects caused by climate change, and the agency's conclusion that climate change will not result in any significant effects on the species in the short-term future."  Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 252.  The Court held that the agency had not provided a reasoned basis for

concluding that climate-related impacts are unlikely to have a significant effect on the status of sea turtles in the short-term future.  See id.  The reasoning provided by the agency – that the effects of climate change will be seen primarily on a century scale – seemed to ignore evidence in the record of present and short-term effects caused by climate change.  Id.  In reaching this conclusion, the Court specifically referenced the record evidence of either present or imminent temperature rise, increased magnitude and frequency of ecosystem changes, and sea-level rise.  See id.  In its Decision Memorandum, issued in response to this Court's remand order, NMFS provided additional reasoning to support its conclusion that climate change will not result in any significant effects on the species in the short-term future.  SAR 52713-15.  NMFS says that this explanation satisfies its obligations on remand.  Notice of Completion at 2-3; NMFS Response at 4-8.  Oceana disagrees.  See Oceana Response at 9-15; Oceana Reply at 2-5.

1.   The Agency's Clarification of its Conclusion About Short-Term Effects from Climate Change on Sea Turtles

Oceana maintains that, on remand, the agency has still failed to account for the effects of climate change reflected in the record.  See Oceana Response at 9-10; Oceana Reply at 3.  Oceana cites to record evidence of past and expected short-term climate change, generally.  See Oceana Response at 10.  And it cites to record evidence that discusses the expected impacts from climate change on sea turtles, specifically.  See id. at 9-10.  NMFS does not dispute the record evidence that Oceana cites, arguing instead that it considered the evidence in the administrative record and concluded that in the short-term, effects from climate change will not have a significant negative effect on sea turtles in the action area.  See NMFS Response at 8.

The agency's Decision Memorandum, issued on March 10, 2016, in response to this Court's remand, clarifies that when NMFS considered the effects of climate change, it

analyzed whether the "past and predicted future effects" of climate change would have a significant effect on sea turtles, specifically.  SAR 52713.  The agency considered the evidence of past and predicted temperature rise, for instance.  See id.  It noted that in the short-term – the ten-year time period that the 2013 BiOp covered – sea surface temperatures are expected to rise less than one degree Celsius.  See id; see also AR 52437.  The 2013 BiOp discussed the expected impacts from temperature rise on sea turtles, generally, such as a potential northward shift in the seasonal distribution of sea turtles in the action area, or a potential change in the foraging behavior of sea turtles at some point.  See AR 52438.  But in the short-term, the agency concluded that the "small increase" in temperature over the next ten years is "unlikely to cause significant effects to sea turtles" or a significant modification to the number of sea turtles likely to be present in the action area.  See SAR 52713.  The agency reasoned that it is "unknown" whether an expected temperature increase of less than one degree Celsius over the next decade is "enough" to cause any shifts in the range or distribution of sea turtles, and it therefore concluded that it is "unlikely" that the expected small increase in temperature would cause "significant effects to sea turtles or a significant modification to the number of sea turtles likely to be present in the action area."  Id. (emphasis added).  In other words, on remand, NMFS has clarified that while there is record evidence of past and expected future climate change, in the short-term these effects from climate change will not result in a "significant effect" on sea turtles in the action area, specifically.  The Court concludes that the agency has provided a reasoned basis to support its conclusion about the short-term effects of climate change on sea turtles, that goes beyond the original rationale it provided.

2.      Sea-Level Rise

The Decision Memorandum also addressed the particular problem that this Court found with the agency's conclusions about sea-level rise.  A study in the record by the U.S. Geological Survey, (the "USGS study") found a 620-mile "hot spot" along the East Coast where sea levels are rising three to four times faster than the global average.  See Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 252 (citing AR 52438).  The administrative record indicated that sea-level rise was relevant to sea turtles in the present and near-term future because it is expected to result in increased erosion rates along nesting beaches.  See id. (citing AR 32563).  This Court held, therefore, that there was a "need for the agency to provide further explanation" for how its conclusion – that any short-term effects on loggerheads would be negligible – is a reasonable one, given the relevance of sea-level rise to turtles, and the evidence that sea levels are rising rapidly.  See id.

On remand, NMFS explained that the "hot spot" identified in the USGS study is specific to an area along the East Coast north of Cape Hatteras, North Carolina.  See SAR 52714. Because the beaches north of Cape Hatteras are rarely used by loggerheads for nesting, the agency explained that the erosion of those beaches would not eliminate a significant amount of nesting habitat.  See id; Notice of Completion at 2; NMFS Response at 4 n.2 (citing AR 52437). Oceana cites to places in the administrative record that indicate loggerheads do, in fact, nest on beaches north of Cape Hatteras annually.  See Oceana Response at 13.  NMFS agrees, but reiterates that the current data shows that nesting in the Mid-Atlantic is "extremely rare," and points out that the records cited by Oceana are outdated.  See NMFS Response at 4 n.2, 5.

To further support its conclusion, NMFS also pointed to evidence in the administrative record that in Florida – the species' most important nesting area in the Atlantic – there is a "future positive trend" for loggerhead nesting.  See SAR 52714 (citing the Van Houtan

and Halley (2011) study); see also NMFS Response at 7-8 (citing AR 45685).  NMFS concluded,

therefore, that any impacts on loggerheads from the sea level rise described in the USGS study

are likely to be offset by the expected increase of loggerhead nesting in Florida over the next few

decades.  See SAR 52714.

NMFS also acknowledged that warming temperatures in the Northwest Atlantic

Ocean could ultimately cause a shift in nesting sites northward.  See SAR 52714.  In that

scenario, the rise in sea level described by the USGS study would constrain the availability of

nesting sites on existing beaches.  Id.  But, the agency concluded, any such shift would likely

occur on a much longer time scale of several sea turtle generations, rather than in the short-term

future.  Id.  The agency's conclusions, based on the agency's evaluation of data within its realm

of technical expertise, are entitled to substantial deference from this Court.  See Cmtys. for a

Better Env't v. EPA, 748 F.3d at 336.  On remand, NMFS has adequately responded to the

deficiencies that this Court identified in the agency's climate change analysis.  The agency has

more clearly explained the connection between the record evidence of present and short-term

effects caused by climate change and the agency's conclusion that climate change will not result

in any significant effects on the species in the short-term future.

3.    Newer Studies Not in the Administrative Record

In their briefing on the Notice of Completion of Remand, both NMFS and Oceana

have cited to studies that were published after the 2013 BiOp was issued.  Oceana argues that by

failing to address more recent studies, NMFS has ignored the best available science.  See Oceana

Response at 11; Oceana Reply at 3-4.  NMFS cited to a study by Arendt (the "Arendt study")

that further supported the evidence it had relied on from the Van Houtan and Halley (2011)

analysis.  See SAR 52714; NMFS Response at 7-8.  But NMFS has explained that its reference

to the Arendt study is not necessary for its conclusions on remand.  See NMFS Response at 7-8.

      "In cases brought under the APA, the Court's review is confined to the

administrative record."  Ad Hoc Metals Coalition v. Whitman, 227 F. Supp. 2d 134, 136 (D.D.C.

2002).  This is because "[i]f a court is to review an agency's action fairly, it should have before it

neither more nor less information than did the agency when it made its decision."  Walter O.

Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984).  A court sometimes may,

however, permit supplementation of the administrative record or consider extra-record evidence

in reviewing agency action.  See Am. Wildlands v. Kempthorne, 530 F.3d 991, 1002 (D.C. Cir.

2008); IMS, P.C. v. Alvarez, 129 F.3d 618, 624 (D.C. Cir. 1997); Am. Wild Horse Pres.

Campaign v. Salazar, 859 F. Supp. 2d 33, 43 n.6 (D.D.C. 2012).[4]  Resort to extra-record

evidence is "the exception, not the rule."  Theodore Roosevelt Conservation Partnership v.

Salazar, 616 F.3d 497, 514 (D.C. Cir. 2010).  The D.C. Circuit has identified at least four

instances where extra-record evidence may be considered:  "the agency (1) acted in bad faith in

reaching its decision, (2) engaged in improper behavior in reaching its decision, (3) failed to

examine all relevant factors, or (4) failed to adequately explain its grounds for decision."

Oceana, Inc. v. Locke, 674 F. Supp. 2d 39, 45 (D.D.C. 2009) (citing IMS, P.C. v. Alvarez, 129

F.3d at 624); see also Am. Wildlands v. Kempthorne, 530 F.3d at 1002 (summarizing these

---

[4]      As other judges of this Court have recognized, there is an important distinction between "supplementing" an administrative record, on the one hand, and considering "extra-record evidence," on the other.  See, e.g., Oceana, Inc. v. Locke, 674 F. Supp. 2d 39, 44-45 (D.D.C. 2009); Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior, 667 F. Supp. 2d 111, 113 (D.D.C. 2009).  The studies cited by Oceana were not before the agency while it completed its Decision Memorandum on remand, so they fall into the category of extra-record evidence.

categories in a somewhat different fashion, in reliance on James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1095 (D.C. Cir. 1996)).

In a footnote, Oceana argues that this Court should look beyond the administrative record to the studies cited by Oceana because NMFS has failed to examine all the relevant factors when reaching its decision.  See Oceana Response at 12 n.6.  But NMFS is correct that this Court remanded to the agency only to "more clearly explain" its conclusion about the short-term effects of climate change, and that this limited directive did not require the administrative record to be updated.  See NMFS Response at 6 (citing Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 252).  The Court has found the agency's supplemental explanations of its conclusion about the short-term effects of climate change to be responsive to its remand order.  See supra sections IV(B)(1)-(2).  There therefore is no need for the Court to assess the impact of these newer studies on the agency's conclusion.  Nor should the Court be the one to do so in the first instance.  Incidentally, NMFS has already reinitiated consultation and is reviewing new information that has become available since the 2013 BiOp.  See Notice of Reinitiation at 3; supra section IV(A).  The Court expects, therefore, that the agency is already in the process of assessing the climate change studies cited by Oceana that have been published since the 2013 BiOp and how they may change the jeopardy analysis for sea turtles.

### C.  Monitoring Take Limits

When the Court remanded this matter to the agency, it also instructed the agency to "provide further explanation regarding the sufficiency of its monitoring mechanisms," and highlighted multiple logical gaps in the 2013 ITS where NMFS had failed to provide a rational explanation in support of its monitoring mechanism.  Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 255; id. at 252-55.

The revised ITS provides a much more robust discussion of gillnet and bottom trawl gear monitoring than the 2013 ITS, and includes a more fulsome explanation of why loggerhead bycatch estimates can only be calculated every five years and why no better monitoring alternatives exist.  Compare AR 52548 ("Sea Turtle Monitoring" in the 2013 ITS) with SAR 52724-28 ("Sea Turtle Monitoring" in the 2016 revised ITS).  Oceana argues, however, that the agency's explanations remain inadequate.  See Oceana Response at 15-20.

1.    Five Year Monitoring

The primary concern that the Court instructed the agency to address on remand regarding its monitoring mechanism was how the agency could reinitiate consultation immediately once an annual take limit had been exceeded, given that take estimates are produced no more frequently than every five years.  Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 253.  The revised ITS differs from the 2013 ITS in that it expresses the numerical take limit of loggerheads from gillnet and trawl gear in terms of individual loggerheads over a five-year period.  Compare SAR 52718 with AR 52543 (expressing the numerical take limit of loggerheads from gillnet and trawl gear in terms of individual loggerheads annually).  NMFS explains that the five-year numerical take limits in the revised ITS "equate" to the annual take limits in the 2013 ITS, see SAR 52718 n.1, and are simply the annual bycatch estimates from the 2013 ITS multiplied by five, because that is how often the agency can reassess the bycatch estimate with available statistical methods, see NMFS Response at 12; see also id. at n.4.

Oceana argues that reframing the take estimate to cover five years is merely cosmetic.  See Oceana Response at 15-16.  It maintains that this change fails to address the fundamental question that the Court posed of how the agency can reinitiate consultation immediately if the take limit is only calculated every five years.  Id. at 16; see also Oceana, Inc.

v. Pritzker, 125 F. Supp. 3d at 253.  In response, NMFS highlights that Oceana's criticism ignores the fact that on remand, the agency has better "explained why it cannot quantify take on an annual basis" and therefore "reasonably adopted a five-year take limit and monitoring period" based on the best available scientific information for loggerhead bycatch estimation.  NMFS Response at 13.

The Court agrees with NMFS.  The revised ITS provides a detailed explanation for why the agency can only produce a "statistically robust" bycatch estimate of loggerhead takes from gillnet and bottom trawl gear on a five-year rotational basis.  SAR 52724-26.  NMFS notes that "data needs; length of time to develop, review, and finalize the estimates; and methodology" prevent the agency from generating take estimates on an annual basis.  SAR 52724.  More specifically, the revised ITS notes that "observed loggerhead interactions are rare," and depend on a wide range of both human and natural factors that vary greatly over a short time period.  Id. at 52725.  The model that the agency uses requires twenty to thirty observed bycatch events, but it is uncommon to have that many observed loggerhead interactions in a single year.  Id.  Thus, the agency must pool data across years to have sufficient information to produce a robust, model-based estimate of total interactions with reliable confidence intervals.  Id. at 52724-25.  In addition, it normally takes a year to process, clean, and analyze the collected data.  Id. at 52725.  The agency did consider whether annual estimates might be preferable.  But in light of the practical constraints on data collection and the existing scholarship on how best to employ sparse data in a reliable manner, the agency decided to undertake "[l]ess frequent but more comprehensive assessments, which explicitly address uncertainty" and that "may provide more reliable information."  Id.  Thus, the agency determined that, for loggerheads, re-estimating

loggerhead takes from gillnet and bottom trawl gear from the batched fisheries approximately every five years amounts to the best available monitoring option.  See id.

The agency has provided a reasoned explanation for why it can only calculate the bycatch estimate of loggerhead takes from gillnet and bottom trawl gear every five years.  In doing so, the agency has sufficiently addressed the Court's concern about how NMFS could comply with its regulatory obligations to reinitiate consultation immediately if the take limits were only produced every five years.  If the bycatch estimates calculated every five years exceed the numerical take limits in the revised ITS for loggerheads – take of 1,345 loggerheads over a five-year period from gillnet gear and take of 1,020 loggerheads over a five-year period from trawl gear, see SAR 52718 – then NMFS can and must reinitiate consultation immediately.

### 2.   Consideration of Alternatives

When it remanded this matter to the agency, this Court also criticized the 2013 ITS for not offering "any indication that [the agency] ha[d] considered alternative methodologies or techniques that might produce take estimates on a shorter timeline."  Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 253.  Oceana argues that in the revised ITS, the agency has again failed to consider any alternatives that would allow the agency to monitor takes on a shorter timeframe.  See Oceana Response at 17.  First, Oceana suggests that NMFS could estimate annual bycatch by using a rolling average of data collected over the previous five years.  See id.  But the revised ITS includes a sufficient explanation as to why NMFS did not adopt this alternative.  The leading scholarship recommends "comparing" average annual estimates derived from five-year averages.  SAR 52724.  See also id. at 52725 (explaining that "when we pool data over five years to report an annual average, we need another five years to compare averages"); NMFS Response at 11 (same).  In addition, the agency explains that the number of observed takes cannot be reliably

extrapolated to quantify an estimate for total takes over shorter time periods because "observed turtle takes are rare events dependent on a wide range of both human and natural factors that vary greatly over short time periods (i.e., less than a year)."  See SAR 52725; see also NMFS Response at 11.

Next, Oceana suggests that the agency should have considered using other statistical models.  See Oceana Response at 17.  It highlights annual monitoring mechanisms that the agency has employed for other fisheries, despite, according to Oceana, "similarly scarce take data."  Id. at 17-18.  But the agency concluded that "no other monitoring alternatives exist for gillnet and bottom trawl fisheries that are feasible on a shorter term than the five-year period required to produce an updated bycatch estimate" for loggerheads.  SAR 52726.  In response to the extra-record examples that Oceana provided, NMFS explains that those other fisheries have more observed takes and different variables that are relevant to bycatch models, emphasizing the "unique" data limitations for the batched fisheries.  See NMFS Response at 11 n.3.

Finally, Oceana suggests that the agency should rely instead on the raw data of observed takes – as it does to monitor the incidental takes of leatherback, Kemp's ridley, and green sea turtles from gillnet and bottom trawl gear.  See Oceana Response at 17.  But the revised ITS explains that the only reason NMFS relies on raw observer data for those other species is because the agency does not have five-year bycatch estimates for those sea turtles "due to so few recorded interactions," so "the raw annual numbers of observed takes are the best available scientific information."  SAR 52725.  The agency explains that raw counts are "less informative," and that it prefers to use a "higher level metric such as a bycatch estimate," when possible, because it is "more informative."  Id. at 52726.

Accordingly, the Court finds that Oceana's argument that NMFS could have considered alternative monitoring mechanisms for loggerheads takes from gillnet and bottom trawl gear provides no basis to question the agency's reasoned judgment.  See Cmtys. for a Better Env't v. EPA, 748 F.3d at 336 ("[Courts] must respect both Congress' decision and the Agency's ability to rely on the expertise that it develops. . . . [We look] only to ensure that [the Agency] adheres to certain minimal standards of rationality.").  The agency did consider alternatives and adequately explained why it found them wanting.  It has selected the best monitoring mechanism currently available in light of the best scientific information available, the practical data constraints, and the agency's technical expertise.

### 3.    Increasing At-Sea Observers

In its prior discussion of the monitoring mechanism, this Court also noted that "NMFS does not explain why data collection cannot be expanded through the placement of additional at-sea observers on fishing vessels," and that "by neglecting to directly address this common-sense solution to its data need problems . . . NMFS cannot rely on a lack of data to justify the infrequency of its ability to generate take estimates."  Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 253-54.   The revised ITS now makes clear that the "lack of data" discussed in the ITS refers to the "lack of observed sea turtle interactions, not a lack of observer data in general." SAR 52726.  This is because, despite NMFS having "an abundance of observer data," observers witness "very few interactions because they are naturally rare events."  Id. at 52726-27. Accordingly, the agency concluded that "[e]ven if more observers were placed on vessels, it most likely would not yield a sufficient number of observed interactions between sea turtles and fishing gear to permit us to estimate the number of takes on an annual basis."  Id. at 52727; see also id. at 52726 ("[S]imply increasing observer coverage throughout the seven fisheries would

not address the limitations that prevent us from accurately estimating loggerhead bycatch and exceedances of the ITS over a shorter time scale.").

The agency has further explained that NMFS must make observer coverage decisions "globally."  SAR 52727; see Notice of Completion at 4.  In other words, increasing observer coverage in gillnet and bottom trawl fisheries would come at the expense of observer coverage for other fisheries managed under the Magnuson-Stevens Fishery Conservation and Management Act of 2007.  SAR 52727.  And, as this Court has recognized in a related case, the agency's determinations regarding observer coverage "do not occur in a silo."  See Oceana, Inc. v. Ross, 321 F. Supp. 3d 128, 141 (D.D.C. 2018).  See also Oceana, Inc. v. Ross, 920 F.3d 855 (D.C. Cir. 2019).  This Court will defer to the agency's reasonable decision that increased observer coverage would not alter its broader take monitoring capabilities.  It therefore will uphold the agency's adoption of a five-year timetable for monitoring loggerhead takes from gillnet and bottom trawl gear.

### 4.  Monthly and Annual Summaries of Observer Takes

Another aspect of the monitoring mechanism that the Court instructed NMFS to better explain on remand was its treatment of the monthly and annual summaries of observed loggerhead takes.  See Oceana, Inc. v. Pritzker, 125 F. Supp. 3d at 254-55.  The 2013 ITS said that the agency would perform an "annual 'review [of] observed takes of loggerhead turtles to consider trends in takes and look for patterns and changes in take levels.'"  Id. at 254 (citing AR 52548).  The Court questioned how "monthly and annual reports of observed takes" could be "usefully compared against annual take limits established in the ITS" when NMFS had asserted that "it needs five years' worth of data to estimate annual take levels."  Id. (citing AR 52548).

Accordingly, the Court directed the agency to provide a "rational response to this question" if one could be provided.  Id.

Oceana asserts that the revised ITS fails to respond to the Court's question.  See Oceana Response at 18-19.  It highlights that the revised ITS "provides no explanation" because in the revised ITS, "the agency eliminat[ed] annual take limits altogether."  Id. at 18.  NMFS agrees in its briefing that "[b]ecause NMFS has adopted 5-year take limits in the revised ITS, on remand it has not provided an explanation for how monthly and annual reports could be compared to the annual take limits in the 2013 Opinion."  Notice of Completion at 4 n.3.  The agency concluded that additional measures for monitoring the numerical take limit for loggerheads from gillnet and bottom trawl gear – beyond recalculating the loggerhead bycatch estimate every five years – are "not reasonable due to the data and statistical methods available." SAR 52712.  The Court accepts this explanation as reasonable and concludes that the revised ITS has eliminated the concern previously expressed by the Court.

## V.  CONCLUSION

NMFS has sufficiently responded to the two issues that this Court directed it to address on remand.  An order entering final judgment for the defendants shall issue this same day.

SO ORDERED.

/s/
_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  October 1, 2020